Please be seated. May it please the Court. We heard about two easements behind the building. Just so we're all using the same terms, I'm sure the Court has read the briefs, but just in using terminology today. The 130 building is a kind of flag-shaped building that has a lot attached to it, a flag-shaped lot with this kind of lot that sits behind the 126 building. The 126 building is owned by the appellee, and the 130 building is owned by my client, Jalot. I think probably the best pictures to get you dialed in would be Defendant's Exhibit I is kind of a shot across the back of the 126 building from the perspective of the 130 lot. Along with that, Plaintiff's Exhibit V is sort of an aerial overview that shows where plaintiff contends these easements are. So if you would, imagine the width, probably about 33 feet, of this 126 building, and it's a zero lot line building. So at that back wall that adjoins my client's lot, there is no property of 126's there. That's undisputed. And there's no property laterally to the 126 building that 126 owns, that Steele's owns. Counsel, let me ask you, could the Eysens have been using the garage door without constantly driving over the prescriptive easement? Because the evidence showed that the overhead door extended only about four inches into the recorded easement. Your Honor, it's clear from the testimony that the Eysens, as the predecessor in interest, was driving all over basically the back of the 126 lot. There was no continuous path. So I'll jump into the prescriptive easement argument at this point, if I may. And that's our central point. There was no continuous use. In the words of Thorworth, Thorworth, their use must be confined to a definite and specific right-of-way. Here, what we had, as far as this prescriptive easement that's contended to run down the middle basically of this lot, there was no continuous use. Let me just stop you and ask you this question I've been wondering about. Sure. Is the mere non-use of the easement, does that in and of itself constitute abandonment? On the recorded easement, that was our argument with the recorded easement, Your Honor. But would it? We wouldn't say the mere non-use. No. Not mere non-use. No. We all know under Lloyd-Foundry and Valentine v. Flower that we need more than that. We need more. And we can show more. We need more than that in this case. Well, okay. Jumping into the recorded easement on the southern end, the 12-foot easement, the affirmative acts we have are that some predecessor in interest to Eysens completely filled in whatever doorway or entryway there was to the back of the 126 building that was within the recorded easement. If the court were to look to Defendant's Exhibit L, what you would see is at this right-hand side of the 126 building, there is no doorway. And that's the way that was for over 40 years, up until a few weeks before the trial in this matter. It sat like that, literally ivy-covered, overgrown. There was no portal truly within that 12 feet. So at some point, some predecessor in interest filled it in. It was left filled in until two weeks before the trial or a month before the trial, I believe the testimony was. Further, Eysens at one point went to knock out a hole in the back of the 126 building in order to put a doorway in. Well, one would think that he would have gone to the recorded easement and come out what had been a doorway there within the recorded easement. Instead, what he did was he went to somewhere where nobody's contended there's an easement and started knocking out bricks there. Eysens gave up on that, sealed it back up after my client called the police. That's at the record 57 and 58. More centrally, Eysens himself filled in, bricked in, cinderblocked in the window that's depicted in Defendant's Exhibit L at some time in the 90s. His testimony was not very specific, but it's clear that Eysens himself caused that window to be bricked in. Let's assume that he did. Sure. Was the window going to be used to enter the building? Your Honor, not to say the window was a door, not to put it like that, but the window was the last vestige of a doorway into the building that was within the recorded easement. That was the sole portal. There has not for up until slightly before trial, there was for over 40 years no portal within the 12-foot easement. So to be unclear, what you're saying is that that is the only affirmative act that you had that they were abandoning the recorded easement, was the bricking in of the window? Your Honor, I would suggest that trying to tear a hole in a wall somewhere to make a doorway somewhere other than the recorded easement suggests that Eysens himself didn't believe he had an easement or was abandoning the easement. But certainly that's the clearest act that Eysens himself performed, but there was no other act that could be performed. Let me ask you a question. Your Honor. In your brief, with respect to this standard of review, what's our standard of review? Well, I think it's a little clear because there's no portal here. I would look for a de novo, but I understand that the Court is probably going to look to a manifest way. Why did you cite a case for the proposition that our standard of review is de novo when the Court in that case, in fact, applied clearly erroneous standard? Your Honor, I think I was thinking that the facts here, because I'm not trying to delve into the facts of – I'm not trying to unwind the trial court's findings. There are factual disputes. Aren't the intent of the parties fact questions? On further thought, Your Honor, yes, and after reading the – Yeah, like your client's testimony that he just – you know, he was asked, how did you get permission? And he says, by allowing this to happen. That was his testimony. Is allowing this to happen acquiescence or is it permission? In this case, Judge, he would say permission. But what's the law say? The law says it's acquiescence, right? Yes, Judge. So to be fair – There are fact questions. There are fact questions. And I guess where I was going with de novo, Your Honor, is I'm not trying to unwind the trial court's fact findings in large part. I'm saying if you take the facts that the trial court found, so on the recorded easement, that there had not been a portal there, an entryway, even a break in the wall since the 90s, and for 20 years before that, there wasn't even a window within the 12 days. What if I own a lot on a lake and I owe acres across the road from the lake and there's an easement, a 12-foot easement or a 16-foot, whatever you want, on the westernmost portion of my lot for access to the lake for the property across the road? And the people over there, they don't have a boat. They don't buy one for 20 years. 20 years later, they say, hey, move that fence. We want to use the easement. We found out we could afford a boat. We got a boat. Is that abandonment? Your Honor, I feel like that's near non-use. And I think the distinguishing factor here is that Isons had an existing portal, a window, I will grant you, and bricked it in. He took the last opportunity, really, to have a break in that wall, and instead of making a doorway, he filled it in, is what I would point to. What authority do you have for that? Your Honor, there are not, to be honest, I was unable to locate any. It's hard to find abandonment cases other than some right-of-way rail cases that I'm not sure I feel are really analogous. Is there any evidence here as to why Isons was choosing that location for a door anyway? When he tried to break through and then stop. Do we know why? We don't know why, Your Honor. Then how does that work against him? It shows the spot he chose, Judge. He, Justice, he picked that spot rather than picking the spot that he would have had the right to use under his argument. He picked some other spot that he had no right to use. Reasons unknown, I will grant you. Then how do you engraft a finding of fact on a reason unknown? Well, the finding of fact I guess I'm looking for is that Isons essentially did nothing, there's near non-use, and when given the opportunity to make a doorway somewhere or the interest in making a doorway, he did not make a doorway at the 12-foot easement, A, and B, proceeding to break in the only thing that was even close to a doorway and where a doorway had been some point prior to apparently 1977. But it still seems to be you're taking that as some type of an affirmative manifestation of abandonment, even though we don't know the underlying reasons at all. Your Honor, that's correct. We did not get into those reasons with Isons as far as the knocking the hole. With regard to the other window, his contention, I believe, was that he wanted to secure the downstairs area of the building, and that's why he filled in the window. But, Your Honor, I think you have to look at this a bit. Is that not plausible? Well, sure, that's plausible, Your Honor, but at some point you have a wall that has no portal in it. He seals up, it has a doorway, he seals up what is there for a portal and then never uses the easement for ingress and egress for the space of 40-some years, he himself. And apparently somebody before him never bricked it up. The trial court looks to this 4 inches and kind of engrafts the 4 inches of the recorded easement into what the court then finds to be a prescriptive easement. It kind of says, well, there's that 4 inches. The 4-inch passageway isn't a meaningful passageway, I would say. It's too narrow. It would have required a trespass on my client's property to even use is a central problem of the 4-inch logic. Your client's not actually using it. It's being used by the standard club? It was being used by Isons for, you're talking about the overhead door? I'm talking about, yeah, and later when the parking, no parking signs were put out. Oh, okay. On to the parking. At the point that the litigation began. Sure. On to the parking, Your Honor. The parking on the recorded easement was rented by my client to the standard as a local wedding type venue adjacent that doesn't have their own parking. So with regard to the parking, the trial court said, well, there is use. There was parking. Well, here's the problem with that. The parking was by permission. And we know that from pages 59 to 61 of the record by Isons' own testimony. At some point, Isons needed parking. He asked Miles Jalot, my client, for permission to park on the recorded easement. Jalot made arrangements with him to park on it. And then at some point, Jalot said, I need all that parking. I need you to not park there anymore. And Isons said, okay. And his testimony, I believe, was essentially, Miles told me I couldn't park there, so I didn't anymore. This notion that there was some parking easement is just false. If we look at the deed. Why does Isons continue to use it? Isons terminated at that point, I believe, completely terminated. Didn't Isons improve that, remove the snow from that recorded easement? Isons did that for different parts of the lot that he had people parking on. Didn't he do that for the recorded easement? He did it, I'm sure, in part for the recorded easement and perhaps even parts of the prescriptive easement, where he had vehicles, basically clearing it for his use. So there would be the question of whose use was he clearing it for. And how does that show an abandonment? He, I don't think that really reflects one way or the other, because he was doing it basically under agreement with Jalot that if you let, Isons saying, if you let my cars park here, I will keep the lot cloud. Think of it more analogous to a rental situation. So I don't see, if we look at the maintenance issue at pages 114 to 118 of the record, the testimony tends to reflect that Isons did things specifically by agreement to facilitate his own use of the recorded easement by agreement with Jalot, not, let's say, as a claim of right to use the recorded easement. Regardless of the circumstances, if he acquiesces or they have an agreement, how does that translate into an intent to abandon? I would still go back to he fills in a window and doesn't use it as far as the non-use aspect for 47 years and really fails to maintain it apart from these agreements. Back on the prescriptive easement issue, I have covered all my points there unless the Court has other questions on the recorded easement. Prescriptive easement, our first red flag is that if you look at the Plaintiff's Exhibit 5, they ask for 15 feet of a prescriptive easement. The trial court ultimately finds a 9-foot-ish prescriptive easement, basically that goes straight to the overhead door. There is nowhere in the record testimony that that was a path, that going straight to the door was ever a path, the path. So by judicial sleight of hand, what's happened is the trial court has basically created, well, that would look like that would be a path. That would be, right, you look at it and say, oh, well, sure, that looks like that would be a path that goes straight to the door. There is no more proof that that's a path than there would be if you put an S-curve across the back of the 126 lot to get to the overhead door or if you depicted, and this was Eisen's daughter's testimony, if you were to drive down the recorded easement partway and then cut over to the center to get to the overhead door, that was a path she would use. There was a period of time, undisputed, that basically was, I don't want to say like a salvage right back here, but there was a lot of things from the business that was using the 130 building that were sitting in this lot, and there were routinely people parking, guests of the 130 building owner. I'm sorry, the items there were from the 130 building owner and the people parking there were from the 130 building owner. So in order for Eisen's to access the 126 building, there were routinely things he was driving around, and there was never this. But counsel, with respect to the prescriptive easement, there's evidence that they, in fact, used that portion of the easement for their overhead garage. Isn't that correct? There is, Your Honor, but my brief response to that would be there isn't evidence that they used that continuously as opposed to multitudinous other paths. Are there any circumstances show that when they used the prescriptive easement that they did so solely because of permission? Your Honor, we haven't really made a battle out of acquiescence versus permission here. My client factually did, but as far as at this point, I'm pointing more to the lack of continuousness and the scope of the prescriptive easement. Let me follow up with one question. Oh, sure. You raised continuous. So how does the case law define what are the parameters of continuous? You say it's not continuous. Isn't that a little subjective? No. Continuousness, it relates to the ongoing use of a continuous use of a specific path. And to be fair, it's not that the path can have no wiggle room, but it has to be a path. A path. Wasn't that the path to the overhead doorway even if it was only four inches? Didn't they still have to drive along that area? Across the prescriptive easement? Yeah. No. The testimony by Eissens, and I'll go back to it in my rebuttal if that's okay, was basically we drove here, we drove there, we just kind of drove willy-nilly to get to the overhead door. Now, obviously, if they were going to line up and try and park in it, they would have had to find their way to center. Right. But how they got there was different from time to time. Day to day there would be different obstacles. There could be a truck parked there. Correct. There could be some impediment. I think there was testimony about there had been dumpsters parked. Exactly, and skids. I mean, if the easement, the prescriptive easement, is not available because of some obstruction, of course they're going to have to drive around it, right? Except that it wasn't a prescriptive easement at that time, and by not using the same path continuously, it never became a prescriptive easement, is the trick. Thank you. Thank you, Your Honor. Ms. Jansen. Good morning. May it please the Court, I'm Kim Jansen here today on behalf of CLS 126 LLC. As the Court has recognized, there are two discrete issues here, the recorded easement and the prescriptive easement. Just very briefly, with respect to the recorded easement, the sole contention there is that CLS or its predecessors abandoned it. Counsel has conceded that this is the intent to abandon is a question of fact. Under the Manifest Weight Standard, this Court should affirm unless it's clearly evident that the opposite conclusion should have been reached by the trial court. And I think there's ample evidence here that there was never any intent by Eisens or any of his predecessors or successors to abandon the recorded easement. Is there any significance to the fact that the Eisens asked for permission to park on a recorded easement? I don't believe the record says that Eisens asked for permission to park on the recorded easement. In fact, Eisens was parking on that recorded easement since 1977 when he acquired the 126 parcel. Gillott didn't take title to the 130 parcel until 2005. So he was parking there for, my math is not that quick, but a good 30 years before Gillott ever even had title to the property to request permission. There is some testimony in the record that at some point Gillott indicated he needed some additional parking, asked Eisens not to park there so that his tenants could park there, and that Gillott, or I'm sorry, that Eisens acquiesced. But as the trial judge found, that's consistent with a finding of acquiescence, not consistent with a finding that he required permission. And again, this is a recorded easement. To abandon it, there has to be evidence that he intended to permanently and for all times abandon that easement. That's just not here. Turning to the prescriptive easement, the argument here – Can I ask you a question about the recording? Of course. The parcel kept emphasizing bricking the window, abandoning the doorway. What do you make of that argument on the issue of abandonment? So two points. First, counsel indicated that Eisens' predecessor had bricked in one of the doorways. That's not what the record shows. The record shows that Eisens had it bricked in sometime in the mid-'90s. But beyond that, the plain language of the recorded easement, as recorded in 1946, is for the equal right to use and for passing over and through for access to the 126 parcel. So the fact that they've bricked it in is completely irrelevant to an abandonment because they were continuing to use the parcel for parking and for driving across it to get to the overhead door. And if that weren't enough, as the trial court found, four inches of that overhead doorway are within the recorded easement, and they continuously use that at the very latest, from 1977 all the way until the present day. So the fact that some doorway or window at some point was bricked in does not – it's certainly not such overwhelming evidence of an intent to abandon that one who did. That would negate a finding of an opposite conclusion, it's clearly apparent. Exactly. Perhaps, and I think it would be a stretch to say that it would be a reasonable conclusion from that evidence that there was an abandonment, but it's not enough that there would be evidence to support the contrary conclusion. The contrary conclusion has to be virtually inescapable. If there are no further questions on the recorded easement, I'll address the prescriptive easement quickly. So counsel makes this argument that you have to have a definite and specific line of travel to establish a prescriptive easement. Well, he mixes that with continuous use. He says it's not a definite and it was not continuous use. Address that. The cases don't say that for a definite and continuous use, you have to keep your tires in the exact same tire tracks the entire time. Obviously, in Thornton, the alley, there's no evidence that these wagons and later vehicles going through stuck to the specific width of one wagon on the exact same straight line the whole time. Nonmaterial deviations from a specific path don't defeat a prescriptive easement. What's important is the boundaries of what they were using. So the witness testified to approaching the garage in different ways, and I think that's what you're getting to. So the question is can a prescriptive easement be created by using a different path on a constant basis? So there's a distinction between using a different path, like in Bogner where they moved the, I think it was an irrigation easement. They moved the entire thing by 9 feet, so it was a completely different path. This is not a case of a completely different path. This is using the same path, but periodically, as one of your honors noted, deviating from that path when there's an obstacle in the way. And you wouldn't be a user that would not be a trespasser because necessity required it, correct? I'm sorry? You wouldn't be a trespasser if you went around a dumpster, for example, to get into the garage? Absolutely. And, in fact, in this case, the testimony was that they went around the dumpster onto the reported easement, so you wouldn't be a trespasser anyway because they had that easement there. So the path is sufficiently definite and specific. The trial court found it to be 6 feet narrower than what we had originally argued. That doesn't mean that the path wasn't definite and specific. It just means that the trial court gave us a little bit less than what we were asking for. But the evidence is clear that continuously from 1977 on, they're using that path to get into the 126 building. There's no way to get into that building through that rear overhead door without traveling across prescriptive easement. The trial court ruled that the third-party trucks could use the prescriptive easement to access the 126 parcel through the garage door. Why should this be allowed if there is no evidence that the third-party trucks previously used that to access the building? There's no evidence in the record that allowing third-party trucks would increase either the amount of use or the overall burden on the parcel as compared to EISEN's own employees' trucks. You know, whether it's an agent of the property owner who's, you know, they're delivering beverages or whatever these third-party trucks might be delivering, or the landowner's employees delivering, you know, equipment and tools and things for the business, the nature of the use is what defines the prescriptive easement. And there's no indication in the record, no argument, that use by third-party delivery vehicles would in any way change either the dimensions of the prescriptive easement or the actual burden on the property. Thank you. Thank you very much. Mr. O'Donnell, your bottle, sir. Let's pick it up there. The nature of the use as far as the scope of the easement, third-party vehicles are completely different from what was ever done. Essentially, we now have a restaurant there that would be, that is open all hours of the night. This is a very different thing from Eisen's testimony that towards the end of the prescriptive period, even though we think the thing's a prescriptive easement, he was using it three to four times a week. He or his employees, which included his wife and his daughter, were using it three to four times per week to either access equipment or for them to park in the building. Allowing access to third parties beyond the control of the 126 property owner is a completely different thing. Just like in River's Edge, a walking path is not a bicycle path. This is different. And frankly, the trial court did really nothing to define the actual use parameters, the use scope of that prescriptive easement, and that's a problem in and of itself. Back to this issue of where the prescriptive easement is located, Thorwood points out for an alley that the wagon trail or the wagon wheels were generally less than two, two feet of variance. There was testimony that 98 percent of the travel was down the same line. Bogner, to Bogner's point, this constant moving around is, in Bogner, they took something and moved it, the irrigation line, they moved it nine feet. Okay. But they moved it before the end of the prescriptive period. Here, I would say prescriptive period never begins because there's never a path. We had Eysen's testimony. My question, did they use a constant path? Well, they certainly did when they got close to the door. How they got close to the door, I, they could have cut across that corner. They could have come from the south. They could have come from the north. My question, it changed from time to time. Eysen's, well, again, when they got near the door, they would certainly be lined up with the door to get in. My colleague, Mr. Lester, summarizes an argument. So that's the way they went in there. Went over both the prescriptive easement area as well as the recorded easement area and utilized both of them in order to access the garage door, and that's the way it's been since at least 1977. Here's the problem. At trial, at Plaintiff's Certificate 5, which was what was blown up and used at trial, they essentially, the prescriptive easement depicted there is 15 feet wide. The recorded easement is 12 feet wide, total 27 feet. If you take all the sum of all the testimony, all of their witnesses' testimony, I'm not talking about Zelak's testimony, their testimony, Eysen's, his daughter Barry, they testified driving across all these paths. So if there's a 9-foot prescriptive easement to be awarded, 27 feet, they drove across 27 feet of path to get there, or 27 feet of land for this 9-foot purported easement. So should we rule that they actually established 27 feet as opposed to 9? I was afraid you may ask that question, Your Honor. Here's the other thing that I was kind of troubled by when I looked at the record. Three different judges reviewed this case. There was a TRO, a preliminary injunction, and then a trial. And all three judges agreed with the plaintiff's position. Your Honor, that's why I'm here. That's a rough mountain to climb. I mean, you didn't mention in your brief that there was a TRO and then a preliminary injunction on these same facts. I'm sorry, Your Honor. I wasn't trying to mislead you. I know you weren't. In terms of brevity. Three different judges looked at that, your arguments, and all agreed with the plaintiffs. And now you're asking us to find that those findings of facts are against the manifest way to the evidence by three different trial courts. Well, actually, Judge, I'm asking for something slightly different on prescriptive easement. I would find that the trial court acknowledged there was no path. No specific path. No specific path. I would say, and therefore, it's a de novo problem, A. B, even were there an implicit path, she kind of found a path. Then I would say that was against the manifest way to the evidence based on everybody's testimony, violates continuousness. To deal with this parking issue under recorded easement, if we look at the deed, plaintiff's own Exhibit 12, the deed from Eysen's to Steele's 126. They refer to the easement at issue as a, quote, non-exclusive easement for ingress and egress. And it's so important to them that they refer to it again at the bottom of the deed. Again, that certain access easement for ingress and egress. And then define the 1946 easement. This notion. So are you then arguing that that language some kind of way creates an abandonment of that recorded easement? I'm suggesting on the parking issue, specifically right now on the parking issue, there was never any parking easement. The parking, this equal right to use is a zero. It's basically the court was playing Solomon, right? I think so. I mean, if you look at the historical use of the property and, you know, if he grants exclusive right to the dominant estate, then it would push the claim out from any, right? Correct, Your Honor. And my concern is simply that there was never any well-founded parking easement. Parking was never a part, even if you find a recorded easement for ingress and egress, parking was never a thing. This is a contrivance. Even they know it per their own deed and per Defendant's Exhibit A, which is language they included in an agreement for the new tenant of the 126 building. They acknowledged it. It's an access easement, not a parking easement. Thank you. Thank you, Your Honor. The court thanks both parties for their excellent arguments today. The case will be taken under advisement. The written decision will be issued in due course. Thank you.